Our first case for argument today is 22-1529, Juniper Networks v. Huawei Technologies. Mr. Kagan, please proceed. Thank you, and may it please the Court, Jonathan Kagan of Irela, Manila, representing Appellant and Cross-Appellee Juniper Networks. So the patent trial and appeals board erred in refusing to consider certain reply evidence and arguments that Juniper put forth in the case below. And I think there are a lot of issues in the case, but I think the easiest way to demonstrate that is we should assume, and we can assume for purpose of this oral argument, that the positions that Huawei took in their patent owner response were correct regarding the limitations on the prior art. So what Huawei argued in their patent owner response is that the primary reference, MOSCHUCK, was limited to HTML root pages. Now, we disagree with that assumption, but let's accept it for purpose of argument today. Secondly, Huawei argued that the Gribble reference was limited to looking at HTTP headers only. That's what they argued in their patent owner response. We disagree. We cited broader language in the petition, and we cited that in the briefs, but for purposes of this argument, again, we can assume that Gribble is limited to HTTP headers only, because then the question is, what is the argument that Huawei made, given those assumptions? And the argument they made, and this was in their patent owner response, and this is on Appendix 451, they say, as would have been known to a pasita, there is no indication in the HTTP response header as to whether the requested HTML page includes active embedded objects or whether the HTML page includes embedded objects at all. So Huawei's argument that they put forward in their response is there is no indication in this HTTP response header about whether there's objects on the page. Is this argument you're making right now, really you're focusing, I believe, on whether the board erred in saying that your response argument was entirely new, right? Yes, that is correct. But even if I agreed with you on that, don't you also have an additional hurdle of showing that there isn't substantial evidence to support the board's alternative ruling? I mean, it said, even assuming that you hadn't presented new evidence, substantial evidence, even if you hadn't presented a new part, even if the argument you presented wasn't new, that there was evidence that they found to be credible, they asked for a declaration explaining why, that still didn't satisfy the claim element. How do you respond to that? Well, so that's actually not a factual determination they made. It's a claim construction argument they made. So what the board did at the end was it said the reason the evidence is insufficient is because the content script type, which is what we pointed to, that tag, doesn't necessarily indicate the presence of an executable object. So that's a claim construction issue, because we're talking about the judging limitation. Does the judging limitation from the 693 patent require that it necessarily determine that there is an executable object? And I'll put it, and so first of all, so it's a de novo issue. It's not a substantial evidence issue. But secondly, and I was going to get to this, but I'll get to it right now. It's actually contrary to what both experts have said in the case. There's no requirement in the patent that the judging be correct. And I'm somewhat embarrassed to tell this court. I mean, you review judgments all the time from other judges. Sometimes they get it right, and sometimes you reverse them. It doesn't mean they're not judging if they get it wrong. It's OK to get things wrong sometimes. So you're saying the detecting by the network device whether the file is an executable file doesn't have to actually detect whether it's an executable file. It doesn't matter whether it works or not? Well, the claim element for judging whether it's an executable device, I assume you're judging by the network device whether the file is an executable file according to at least one of the requests in the data stream carrying the file from claim one. Is it because of the word judging that it doesn't matter whether it's correct? Well, the real reason it doesn't matter is what we're talking about is malware. We're talking about something where the hackers and the people that are doing this are not kind enough to let us know, hey, this is a piece of code that I'm trying to infect your computer. And so mistakes get made by this all the time. And everybody, every expert in the field recognizes this. But it's not judging whether there's malware. It's judging whether there is an executable file. That's correct. I'm just giving the context for this. The way this patent works, it assumes if there's an executable file that it might be malware. So then what it does is it takes that and it doesn't allow it to pass through the user computer. It instead puts it in a virtual machine, sort of safe environment. I want to explore some of the arguments about whether or not the information was new. So I think part of the argument you were making was that you had a broader disclosure on Gribble. Is that right? In Gribble. In Gribble. Yes, for sure. In terms of just giving the citation to those relevant ranges, I'll say pages or whatever, but not necessarily in line numbers, but not necessarily actually talking about the additional part in that broader disclosure. Is that a fair statement in terms of kind of? Yeah, so what I would say we did is we talk about Gribble's broader disclosure, but when we analyze it, we just analyze one specific example. And so we took the example from Gribble where Gribble is looking at web objects. So it's looking at individual objects, not group pages. But Gribble, by its terms, if you look at Gribble, it expressly says, look, this is just an example. This is not limiting. I mean, that language is all in Gribble itself. And so in this way, this case is actually very similar to the Apple v. Andrea case. In the Apple v. Andrea case, the patent owner, the petitioner, filed a petition and said there was an algorithm that was being used there. And they provided an example. They said, look, if it had to do with the number of sub-windows, said if there's one sub-window, you combine this with Hirsch, and it has every element of the patent. Are you also familiar with our Ariosa and Dell cases? Yes. How do you distinguish those cases? Well, so in Ariosa, what actually happened in Ariosa was there was a bit of confusion, I think, about what the board had done in terms of excluding certain evidence. But the key to those cases is that we are not changing our theory of patentability. So what you have in Ariosa, well, and Dell, I believe, is they were changing the theory of patentability. They were saying this is different than what we had described earlier. So in Dell, for example, it was an oral argument that this new theory was introduced. So counsel at oral argument just said, here's a new theory of invalidity. Well, I don't think that it matters whether it was in reply or at oral argument. I mean, I didn't think that was a significant factor in the Dell case. I mean, I think either way, you could have a waived argument. Agreed, agreed. So why isn't it waived when it's raised in the reply? Because this is not a new theory of invalidity. No, it's exactly. What do you mean by theory of invalidity? This is what I'm trying to understand. So what we do is we say, if you take the Moschuk system, which includes getting requests, sending requests to the web, receiving pages back, and if it contains an executable, sending it to a virtual machine for examination. Taking that, combining it with Gribble's way of determining whether it has an executable by looking at the file header, that's the invention. Or that's the claim combination here. That's what we claimed in the petition. And as I said, for purpose of oral argument, we'll say, we can argue. Let's limit it to the HTTP header. So what's happened here, just as in Apple, is Huawei came up with a different example. They said, no, no. You need to look at the HTTP header. So then in reply, we have the right to say, okay, well, even if you look at the HTTP header, there's info and the root page. There is a way that... I thought what they said was what you pointed to, which I think was content type in the HTTP header, didn't actually identify where there's an executable file. So do I not understand that? Well, we never mentioned content type in the petition. In the petition. We never mentioned content type. You just said that HTTP header. Right. Now, the example from Gribble was a content type header, but that works with web objects. It doesn't work with web pages. It works with root pages. In reply, you expanded and said, no, no, look at the whole header or look at something else. Well, all we did was say, look at the header. We said, if you were a person of skill... Because as I said, Gribble was using a particular example. And they're clear in the patent that they're saying this is just an example. So if you're looking at it as a header, what their statement is, there's nothing that you can look at in the HTTP header that's going to tell you if it's an executable file. When you say they. Huawei, I'm sorry. That was their statement. The patent owner responds, page 451. They say there's no indication in the HTTP header in the context of looking at HTML root page. And we said, that's not true. We said, here's the specification. And what it tells you, the HTML specification itself says, if you're going to have an executable, which is a script in a page, on a web page, you need to specify, you need to say up front in the header what language you're using. Because otherwise it will not operate properly. So therefore, one of skill in the art... What line is that? I'm sorry, what? What line is that in the header? That's the content script type line. Thank you. So, and again, we submitted the evidence from the HTML specification of that. We submitted a declaration from our expert indicating that. It's in the HTTP header, exactly as they said. What Huawei then did was on their, in their SIR reply, that's when they changed and said, oh, now it's looking just at the content type header. And the content type header itself doesn't, won't tell you that. But we have never limited. I mean, there was not even an argument in the patent owner response that this is somehow limited to the content type header. And that would be very, as I said, it would be contrary to what this court ruled in Apple v Andrea, which is, you can use a different example that's within the scope of the patent to demonstrate that's, that's perfectly acceptable. And that's... We're into your rebuttal time. Do you want to save time? I will reserve the rest of the time. Thank you. Mr. Kortenkamp. Thank you, Chief Judge Moore. Robert Kortney representing Huawei. I'll begin with the primary appeal, turn to the cross appeal at the end. I want to respond to some of the conversation we just had. Chief Judge Moore, you pressed my colleague, Mr. Kagan, on the theory of invalidity that Juniper was presenting. And I think it's telling that Juniper immediately said, well, let's talk about Huawei's submissions to identify the theory of invalidity. But that is not the test. The rules empower the board to look at the petition to see the theory of invalidity. That's an appendix 187. And when we look at appendix 187, the theory of invalidity that they lay out, we begin with the design principally established in the Moshuk reference, going to make a single important modification to it based on Gribble. And appendix 187 says we're going to bring in the part of Gribble where it looks at application octet screen header. Now, that is the content type header. Gribble expressly says that's the content type header. So the theory of invalidity they presented at the time of the petition makes no reference of any outside header indeed. What about the fact that when they said application slash octet screen, they said EG? I mean, they said specifically to see if the HTTP header is associated with an executable EG. So isn't that just an example? In Gribble, it is an example. But I think this case illustrates that the board looks at the language of the petition. So how am I I'm just asking, like, is it reasonable to say they say the HTTP header and then they say EG application slash octet screen? So maybe something else in the header could be included in what they're relying on? I think if Juniper wanted to rely on something beyond the example given, the petition would have been an excellent time for them to articulate that. How many different things are in the HTTP header? There are a bunch. There's at least six elements. We lay out some of them. That's less than helpful. Our briefing actually, I think, quotes the line, content script type is not in all HTTP headers. It's an optional field. But I think the board's decision here was that the burden is squarely on the petitioner, on Juniper. If it wants to fill in that EG, it should do that at the petition stage. Because what we have instead is a patent owner that looks at the petition, says they're relying on content type. We went and got an expert, consulted with the expert, submitted the expert's opinions. The expert said content type won't do it. Here's all the problems with it. What about the fact that they said to the broader disclosure? I think I was talking a little bit with opposing counsel about that. Do you feel like then that allowed them to go into the discussion later on the well-known signature, et cetera? I don't when you look at the context of that. And I think the board, we are under abusive discretion review here. It was extremely very reasonable for the board to look at that and say, yes, you have a string site to 12 lines of gribble, but you also explicate that string site at page 187 of the appendix. And you say we're specifically, using that word specifically, modifying our primary reference according to this application octet stream. And the board said, once you've said that, and your adversary has built their evidence based on that, to then make a pivot and say, well, actually, there was something else hidden in that EG that we didn't mention in the petition. You're making that pivot after your adversary, in this case, Huawei, no longer has an opportunity to submit new evidence. The board's rules preclude Huawei from presenting new opinions from their own expert on this issue, preclude Huawei from presenting new documents addressing this. So this is absolutely an issue that Juniper lay behind the log. And then after the response came out, said, ah, you didn't think of content script type. You didn't think of the head element of an HTML header. And now Huawei, under the board's rules, has no ability to present new evidence. Now, do they rely on both the head element and the content script type? They're bringing alternatives. That's maybe a better question for Mr. Kagan. I understood them representing as kind of an either or. Certainly, Mr. Kagan's argument only relied on the HTTP header, which would be content script type. Also, I think Apple Andrea is very instructive. I think my colleague has misread it. In Apple Andrea, Apple's contention was that the number of sub-windows did not matter for purposes of their assessment of these algorithms. So they arbitrarily said, well, if it's one, here's a discussion of how things work if the number of sub-windows is one. Their adversary said, no, we think it does matter. We think there's a different outcome if the number of sub-windows is two. And Apple came back and said, no, it doesn't matter. Here's why you're misreading the reference. And even if you were right and the number of sub-windows was material, it wouldn't change the outcome. So that is a petitioner defending its position, defending the language in the petition against an attack from its adversary. Here, we have Juniper abandoning the language in its petition. They are not here seeking review of the board's decision that the arguments in the petition were insufficient to establish unpatentability. Do you want to address the board's alternative ground, which is that even assuming it wasn't a new argument, we still find that the firework doesn't teach the claim element. Could you address that? Certainly. So as to the content script type header, Huawei was unable to present new evidence, but was able to rely on the documents that Juniper itself had put into the record and pointed out that even in those documents, the content script type header only declares a default language for the script. If there is a script, you could declare that element and maybe there's no script at all. There is no record on how well, if at all, content script type relates to executability, because Huawei had no opportunity to build one. What do you think of the board's use of the word necessarily? Is there something to be implied from that? What I take from that is the board is saying, Juniper failed in its proof burden. Juniper's obligation is to show that this header performs the judging according to limitation. They've pointed to this header, but it doesn't necessarily have anything to do with executability. So Juniper has failed in its burden. It's not a claim construction issue. It is absolutely substantial evidence review in our assessment. And what do you think about the word judging? Does judging make it so it doesn't have to necessarily be correct all the time? Or actually, sometimes it just, I don't know, I was just curious about your thought on that, since it is a claim construction issue now being raised. I think this claim requires the act of making a determination as to executability. This claim does not, no, I guess I think it does have to be at least usably accurate in some way that the invention is operative. If it's making decisions at random, right, that's not judging. It has to be some kind of, I'll call it evidence-based determination. But the claim does not impose specific accuracy requirements. Finally, I'd like to direct the Court, I'm sure the Court is already familiar with yesterday's opinion in Medtronic, that's Appeal 2357. We think Medtronic is highly instructive here. There, as here, the petitioner presents an initial theory. The adversary comes back and says, your theory has holes, right, there would need to be a whole lot of additional modifications made to your theory for you to prevail. The petitioner comes back and says, oh, right, okay, here's a whole new bunch of modifications. And the Board declined to consider that. The Board is empowered to enforce its own rules that put the emphasis on the petition and the burden on the petitioner. The petitioner is the lowest cost avoider for these kinds of problems. The Board has discretion to identify that. And here we think the Board's decision was clearly within that discretion. If I may, I'd like to turn to the cross-appeal. So we have different claims, different set of references. The issue here is the content of the Dubrovsky reference. We are again on this judging limitation. And for this limitation, the petition is unambiguous. It relies exclusively on Dubrovsky for the judging limitation. This is at Appendix 214 to 15. There is no mention of modifying Dubrovsky. There is no mention of anything other than we're going to take Dubrovsky's disclosure and that will be sufficient to practice the judging limitation. However, we also have it undisputed at this stage that Dubrovsky does not actually teach how it makes determinations as to executability. At Appendix 214— But the claims don't specify that it has to determine how it makes the determination for executability, only that it be determined from certain information. The claims themselves don't require what you're saying. So respectfully, I read the judging according to limitations saying the judging according to one or both of the data stream or the URL. So the judging has to be according to those. Right, according to the data stream or request. Yes, that's correct. But that's all it says. That's correct. But the judging must be driven by one or both of those features. Well, why doesn't substantial evidence support the board's finding that Dubrovsky determines whether the file is executable according to the data stream? Because there's unrebutted evidence in the record, actually agreed evidence in the record, that there are ways of judging executive— No, not judging. Stop using the word judging because when you're— that's my problem. When you use the word judging and the evidence that you're referring to isn't using the word judging in the way that you and I just defined it, which is all the claims require that it be according to the data screen or according to the request. So focus on that. What is the evidence that Dubrovsky doesn't disclose judging according to the data stream or the request? Thank you. So we know from Dubrovsky— and this is at Appendix 1855— that it is somehow making a determination that a file is or is not executable. It doesn't say how. Juniper described this situation at Appendix 227 as agnostic. Dubrovsky is a black box on this issue. Huawei presented opinions from Dr. Davis describing how there were ways to practice this— to implement this— Yes, but Dr. Nielsen testified that because the only external inputs to the gateway relate to the requested file are the data packets and URL requests, a skilled artisan would understand that Dubrovsky uses URL requests or the data packets to determine whether the file is executable. So why isn't that substantial evidence? Because at the same time, Dr. Nielsen conceded that there could be other ways of doing this outside of using those two elements. This is at Appendix 9666. But the board can make the credibility determination here, right? In terms of what it's going to believe. Certainly, the board can make credibility determinations, but those have to be determinations that a witness— you know, it's not telling the truth, right? It is somehow misdirecting in their testimony. There's nothing like that here. Dr. Davis described how, in his opinion— Dr. Davis, this is a substantial evidence question. So whether your expert put on contrary evidence isn't relevant. Dr. Nielsen testified that a skilled artisan would understand the Dubrovsky reference uses the URL requests or the data packets to determine when the file is executable. I don't know why that's not just the end of your cross appeal. Because he also testified that there could be other ways of doing it. So we are— There could be other ways, but he testified that a skilled artisan reading this reference would understand these to be the ways to do it. I think when a witness says— So the way I respectfully read that is a witness makes a broad statement in his initial declaration, and then is, frankly, impeached on that statement during deposition, and then makes a concession. And I think when board sees that initial statement, impeachment, concession, to rely only on the initial statement— The board didn't understand you to have impeached him, is your problem. You are claiming you impeached him, but the board did not understand his testimony as having been impeached. And that's why we think the board's decision lacks substantial evidence support, because we think this court, reviewing that record, and also reviewing that Juniper itself referred to Dabrowski as agnostic on this point— I guess I am also a little incredulous about your having impeached him, because doesn't figure one of Dabrowski at page 1848 of the appendix only show URL requests or data streams? There's no dispute that the system of Dabrowski has access to those— Not has access. Dabrowski itself doesn't disclose anything else. You asked him, could there be some other magical way of doing this? But Dabrowski doesn't disclose some other magical way of doing it. So why wasn't the board, quite frankly, reasonable in relying on his representation that this reference discloses only these two ways, and so a skilled artisan would understand these two ways to be the way it's done in this reference? Of course, it's possible some other way could be used, but that's not what's disclosed in this reference. Figure one only discloses these two ways. So I'd like to respond. I'm into my rebuttal time. I will just say I think Dabrowski makes no disclosure as to how the executability determination is made. Yeah, I have a question for you. How does your patent do that stuff? I read the 693 patent, and I'm having a hard time seeing what its specificity is on whether their file is an executable file. And I realize that you might say that's not an issue here, but thinking about that in terms of the level of specificity required, because we're looking at that same limitation with regard to several pieces of prior art here. So I'm trying to understand how yours works and some of these, according to you. So the way, again, not of issue, as your Honor probably knows. Yeah, it might be relevant. It works exactly as the claim does, which is that the invention is able to look at, not, it doesn't require a complete file. It can look at the stream as it comes in and look for indicators of executability, or it can look at the URL itself, the link to the data, the address. How? Like, what specifically is it looking at? I mean, I'm going maybe a little beyond. I don't have citations prepared, but my understanding is it can intercept the data stream as it, it can intercept the request to begin with, so it sees the address, and it can intercept the data stream as it's coming through, and then analyze that data stream for signifiers of executability. And that's described in the specification. There hasn't been a challenge on that basis. I understand. I'm just trying to understand how it works, and as I said, because the level of specificity in the reference and looking at the prior, it kind of matters, since we're all looking at the same limitation. Anyway. Okay, thank you. Okay, we'll restore your rebuttal time if opposing counsel addresses the cross appeal. Thank you. Mr. Kinkin. Thank you, Your Honors. I think with Dabrowski, the court has it right. The disclosure shows there's two inputs. And two inputs only in figure one. And then it makes a determination based on those inputs. And that's what Dr. Nielsen says, and that is substantial. I've been supporting that finding. The gateway device in this disclosure, that's what's showing. Some alternate disclosure, there could be other ways of determining executability, but for Dabrowski, those are the two inputs. That's the information. That's what the gateway device makes, makes the disclosure. And then turning to the discussion of Apple. I think somebody's probably misreading that case here. But here's my understanding of what happened in the Apple case, the Andrea case. And I obviously invite the court to look at it and reach its own determination. But what happened was, the petitioner in that case cited an example of an algorithm using one sub-window. And say, if you have this one sub-window and you combine it with Hirsch, you have all the elements of the patent that we're challenging. What the patent donor said in response is, you can't use one sub-window. If you only use one sub-window, then you won't combine it with Hirsch, which is what you need to do in order to get the combination that invalidates the patent. They said you have to use two sub-windows. And if you use two sub-windows, which is a different example, then it doesn't meet all the limitations. So then there'd be a motivation to combine it with Hirsch, but then you would not meet all the claim limitations. What Apple said in response is, no, even under your example, the example that you provided with two sub-windows, it meets all of the limitations. The board excluded that evidence that it's a new argument, and this court overturned it. It said, no, that's a legitimate reply to the example that Andrea provided. And what the court said is, it is unreasonable to hold petitioners to such a high standard that if they choose to rely on one example of an algorithm, they must disclose all potential permutations of the variable or risk waiving the opportunity to further discuss other relevant examples in their reply. That's exactly what's happening here. We provided an example in the petition using the exact example that was shown in Gribble, which was when you're looking at web objects and that you can use the file content, although we didn't limit it to that and we never mentioned that, but we just used that example because that was in the patent. Then what Huawei said is, well, if you use that combination, basically it doesn't work with MozChuck because that's a root page. And we said, okay, if we're using the example of the root page, then here are the other fields in the HTTP header that you will look at. And the file content script is an example because we presented evidence from the HTTP specification that in order for that to operate correctly, if you have an executable on a page, you need to have a script definition. You need to have that field there to tell the page what to do. So this is something, and we've submitted evidence that when a skill in the art would know, therefore they would look to that tag. That is a legitimate reply to their argument on page 451 of the appendix that there is no indication in the HTTP header of whether there's an executable script on a webpage. Thank you. Mr. Courtney, I'll restore your two minutes of rebuttal time. Of course, it's limited to the cross appeal. Thank you, Your Honor. And with that time, I'll just direct the court. My colleague pointed out, well, Dabrowski only has these two inputs. How else could it be doing it? The court has addressed those kinds of circumstances before. We had directed the court to Institute Pasteur, 738 F. 1337. There you had prior art references that came awfully close to describing cleaving chromosomal DNA, but did not actually describe it. We had testimony from experts describing how, oh, we would get very close. This is almost there. And this court vacated that and said it was not sufficient. Even more on point, it's non-precedential, is the Google versus at-home bondholders case. It's in the briefs. That case, I think, is very apt here. It uses the phrase, silence is not a genus. The theory was ventured that because it was silent, it somehow disclosed all possible ways of fitting that determination into the blank box that was present. This court squarely rejected that, and we think that guidance is persuasive here. Okay, thank you, Mr. Courtney. I thank both counsel. This case is taken under submission.